**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HARRY WATKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 20-597 |
| PENNSYLVANIA DEPARTMENT OF | ) | Judge Nora Barry Fischer |
| CORRECTIONS, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.      INTRODUCTION

In this employment law case, Plaintiff Harry Watkins ("Watkins") claims that he has been subject to a hostile retaliatory work environment by the Pennsylvania Department of Corrections ("DOC") after having given deposition testimony detrimental to the DOC in an unrelated matter, and that additional retaliation resulted after he filed five administrative complaints with the Equal Employment Opportunity Commission ("EEOC") and/or Pennsylvania Human Rights Commission ("PHRC"). Presently before the Court are the Defendant's Motion for Summary Judgment, Brief, and Statement of Material Facts, (Docket Nos. 35-37); Plaintiff's Response, Brief, Response to Statement of Material Facts, and Statement of Additional Material Facts, (Docket Nos. 38-42); Defendants' Reply Brief and Reply to the Statement of Additional Material Facts, (Docket Nos. 46-47); and Plaintiff's Sur-Reply, (Docket No. 50). The Court heard oral argument on October 7, 2021, and has reviewed the official transcript. (Docket Nos. 54; 55). After careful consideration of the parties' arguments in light of the controlling standards, and for the

following reasons, the DOC's Motion for Summary Judgment [35] will be granted.

II.     FACTUAL BACKGROUND[1]

Watkins has worked for the DOC at SCI Mercer from June 2008 until the present. (Docket Nos. 36, 40 at ¶ 2). He started as a corrections officer trainee, and has since obtained the title of corrections officer 1. (*Id.*). Watkins joined the Pennsylvania State Corrections Officers Association Union (the "union") and served as union president for SCI Mercer from January 1, 2016 through December 31, 2019.[2] (Docket No. 36-2 at 19-20). On November 14, 2018, in his capacity with the union, Watkins was deposed in the case of *Vanderslice v. Pennsylvania Department of Corrections*, Civ. No. 17-472, ("*Vanderslice*") wherein a female employee at SCI Mercer sued the DOC for discrimination and retaliation. (Docket Nos. 36, 40 at ¶ 3). Watkins contends that his deposition testimony in that matter was favorable to Ms. Vanderslice and detrimental to the DOC. According to Watkins, his testimony precipitated pervasive and ongoing workplace retaliation against him. (Docket No. 36-2 at 14-15).

On November 29, 2018, Watkins' wife, Michelle, applied for employment with SCI Mercer but was not immediately hired.[3] (Docket Nos. 36 at ¶17; 36-8 at ¶ 2). Watkins responded by filing his first EEOC/PHRC administrative complaint on June 7, 2019, claiming that Michelle's application was rejected in retaliation for his protected activity of giving deposition testimony in *Vanderslice*. (Docket Nos. 36, 40 at ¶ 21). On June 10, 2019, Watkins faxed a copy of his first

---

[1]     The facts herein are compiled from the parties' respective Concise Statements of Material Facts ("CSMF"), their Replies thereto, and their Appendixes. (Docket Nos. 36-37, 40-42, 47). Unless otherwise specified, the facts of record are uncontested. Any disputed evidence is viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his  favor.")

[2]     Watkins' term as union president ended on December 31, 2019, when his term ran out and he decided not to seek re-election. (Docket No. 36-2 at 20, 22). He remains an "executive board officer" for the union, which he describes as a senior steward position with no benefits. (*Id.* at 62).

[3]     Though Michelle Watkins was not immediately hired after applying for employment with SCI Mercer, she was eventually hired and is currently employed at SCI Mercer as a corrections officer trainee. (Docket No. 36 at ¶ 20).

EEOC charge to the Human Resources ("HR") department at SCI Mercer. (Docket No. 36-3 at 28). The fax would have been received in HR by Lori Mahlmeister ("Mahlmeister"), Chelsea Laughery ("Laughery"), or another HR clerk, and shared shortly thereafter with Superintendent Melinda Adams ("Adams"). (Docket Nos. 41, 47 at ¶¶ 2-3).

Following the filing of his first administrative complaint, Watkins asserts that he began experiencing workplace retaliation in June of 2019, including: being reassigned to a different unit on June 8, 2019; receiving what he considered to be a poor rating of "satisfactory" on his June 26, 2019 annual performance review from Captain Theron Robbins ("Robbins") and Lieutenant James Johnson ("Johnson"); and being ordered by Major Paul Brocklehurst ("Brocklehurst")[4] on June 26, 2019 not to speak to trainees on behalf of the union during work hours, except over the lunch break. (Docket Nos. 36, 40 at ¶ 25).

On the same date, Watkins was accused by Robbins of insubordination and abandoning his post after Watkins admittedly failed to work an overtime mandate for which he was selected. (*See* Docket No 36-9). A disciplinary investigation followed, and Watkins ultimately received formal discipline in the form of a verbal reprimand. (Docket Nos. 36, 40 at ¶¶ 40-41). The discipline was elevated to, and approved by, Adams. (Docket No. 36-9 at 1).

The next day, Johnson allegedly went on a rant, complaining to Corrections Officer Kevin Jones ("Jones") about certain union members, in particular Watkins. (*See* Jones Decl., Docket No. 42-3). Specifically, Johnson was upset that Watkins' refusal of the mandate resulted in his wife having to work the shift. (*Id.*). Ultimately, in a written statement dated June 30, 2019, Jones noted that "[Johnson] also made statements about how Watkins hated him because he 'makes him do his

---

[4]       Certain evidence in the record, including the Watkins deposition transcript, (Docket No. 36-2), and the Defendant's CSMF, (Docket No. 36), refer to Maj. "Drocklehurst." However, the DOC disciplinary record that was filed, (Docket No. 36-9), demonstrates that the correct spelling is Brocklehurst.

job,' 'won't put up with his (Watkins') bullshit,' and 'Watkins thinks he is smarter than me, well we will see I can make his life hell." (*Id.*). For his part, Johnson testified that he did not recall making those comments to Jones, but that it was possible he did so in a fit of anger. (Docket No. 36-4 at 13-14).

Based on his perceived mistreatment from Johnson, Robbins, and Brocklehurst following the first EEOC complaint, Watkins filed a second EEOC/PHRC administrative complaint on July 19, 2019, again claiming retaliation and a hostile work environment. (Docket Nos. 36, 40 at ¶ 23). The harassment and retaliation continued following his second EEOC charge. On July 24, 2019, he was again accused of abandoning his post, this time by Johnson. (*Id*. ¶ 39).  This incident resulted in a fact finding, which is an investigative interview during the course of the disciplinary process, but Watkins ultimately received no disciplinary action therefrom. (*Id.* at ¶ 41).

Watkins filed a third EEOC/PHRC administrative complaint on August 5, 2019, raising additional claims of retaliation and a hostile work environment based on gender. (*Id.* at ¶ 37). Afterwards, Watkins became aware of a voicemail Johnson left for Corrections Officer Brian Muszynski ("Muszynski") on or about October 21, 2019, wherein he asks Muszynski to come in to work overtime because he only had females working in the yard that shift. (Docket No. 36-2 at 35-36, 38). The parties dispute whether the voicemail references Watkins, (*See* Docket Nos. 36, 40 at ¶¶ 46-47; 41, 47 at ¶ 14), but Watkins contends that the message challenges his masculinity. (Docket No. 36-2 at 35-36). A few weeks later, around November 13, 2019, Muszynski played the voicemail message for his coworkers, including the female corrections officers it references, causing Watkins additional embarrassment. (*Id.* at 38).

On December 19, 2019, DOC Corrections Unit Manager Wendy Rouda ("Rouda"), who is married to Robbins, sent an email to Watkins and his supervisors accusing him of failing to conduct

his cell inspections during his December 17, 2019 shift. (Docket Nos. 36, 40 at ¶ 49; 36-5). Watkins sent an email response with a photo of the log book showing that his cell inspections had been completed as required that day. (Docket Nos. 41, 47 at ¶ 20). Watkins did not receive any further related emails and he was not disciplined as a result of the same. (*Id.*).

During this time period, Watkins also reports experiencing repeated payroll errors. (Docket No. 36-2 at 64-65). He admits that payroll errors have happened in the past prior to the onset of the events of this lawsuit, but contends that they have become much more frequent in the wake of his protected activity, such that he rarely receives correct paychecks. (*Id.*). Watkins has attempted to resolve his ongoing payroll issues with the HR department at SCI Mercer, but he has not inquired about fixing the issue with the state agency in charge of the same. (Docket Nos. 36, 40 at ¶ 54). Based on the payroll issues and other perceived retaliatory conduct, Watkins filed a fourth EEOC/PHRC administrative complaint on February 10, 2020. (*Id.* at ¶ 44).

On April 12, 2020, Watkins suffered a work injury wherein he tore his right bicep. (Docket Nos. 41, 47 at ¶ 23). His injury required surgery, which was performed by Dr. Singh on April 30, 2020. (*Id.* at ¶ 26). In mid-May of 2020, Watkins was ordered to return to work the light duty post of "third shift lobby," a position which did not exist prior to his injury and about which Watkins had several complaints. (*Id.* at ¶ 28). To avoid working the third shift lobby post, Watkins took two weeks of personal vacation followed by an extended period of medical leave ordered by his personal physician. (*Id.* at ¶¶ 31-32). His complaints about his light-duty post were the subject of his fifth and final EEOC/PHRC administrative complaint, which was filed on July 28, 2020. (Docket No. 36-2 at 65-66).

Watkins returned to full duty on September 1, 2020, (Docket Nos. 41, 47 at ¶ 33), and he accepted a shift bid for the third shift, 10:00 p.m. – 6:00 a.m., partially in an attempt to get away

from Johnson and to work a quieter shift. (Docket No. 36-2 at 48-49, 59, 70). Shortly after he began working the third shift, Johnson was reassigned to the same shift, though the men did not have any issues while working together on that shift. (Docket Nos. 36, 40 at ¶ 59).

After Watkins' return to work in September, he received an email from Lieutenant Brian Mitchell ("Mitchell") scheduling him for an overtime mandate in order to complete his required annual firearms training, which Watkins had previously been unable to complete due to his injury. (Docket No. 36-2 at 59-62). Watkins was not available on that date and did not attend the session. (*Id.*). He did not receive any follow-up emails or discipline for failing to work this mandate from Mitchell, and he never obtained his certification for the year 2020. (*Id.*).

In January of 2021, Watkins returned to first shift, where he no longer works directly with Johnson. (*Id.* at 74-75). He reports no issues with his current supervisors, though he continues to experience payroll issues on a regular basis. (*Id.* at 75-76). He claims that the aforementioned instances of perceived harassment at work triggered his Post-Traumatic Stress Disorder, (*Id.* at 52-57), causing him to seek counseling for his mental health issues from the Fall of 2019 until August of 2020. (Docket Nos. 47, 47 at ¶¶ 36-37).

### III.   PROCEDURAL HISTORY

On April 23, 2020, Watkins filed suit in this Court. (Docket No. 1). His Amended Complaint, which was filed on October 1, 2020, raises one claim of retaliation under Title VII at Count I based on the DOC's failure to hire Michelle Watkins, along with claims alleging a retaliatory hostile work environment under Title VII at Counts II and III, based on the events subsequent to each of his five EEOC charges. (*See* Docket No. 17). Following the completion of discovery, (*See* Docket No. 34), the DOC moved for summary judgment on all counts on May 21, 2021. (Docket No. 35). In his response thereto, Watkins indicated that he was no longer pursuing

his claim of retaliation at Count I of his Amended Complaint, but opposed the entry of summary judgment as to his hostile work environment claims at Counts II and III. (Docket No. 38). The Court entered an Order granting summary judgment, in part, as to Count I, (Docket No 53), and the parties proceeded to brief and argue their respective positions for and against summary judgment as to the remaining claims at Counts II and III. Accordingly, the Motion for Summary Judgment [35] is ripe for disposition.

IV.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).  "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (citations omitted). Further, "[a] dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A party seeking summary judgment "must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 160 (3d Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings." *Conboy*, 992 F.3d at 160; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In this regard, the non-movant must come

forward with more than "some metaphysical doubt as to the material facts." *Conboy*, 992 F.3d at 160; *see also Matsushita*, 475 U.S. at 586-87.

In order to determine whether a genuine issue of material fact exists, the Court's analysis begins by a review of the parties' filings to determine the realm of potentially disputed facts. As such, all summary judgment filings must comply with Federal Rule of Civil Procedure 56, as well as this Court's companion Local Rule 56. Both rules "allow facts to be deemed admitted where they are not properly opposed." *See Kelly v. DeJoy*, No. 19-204, 2021 WL 914207, at *4 (W.D. Pa. Mar. 10, 2021) (Hardy, J.); FED. R. CIV. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion."); LCvR 56(E) ("[M]aterial facts set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be undisputed, will for the purposes of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party."). The Court now turns to the instant motion for summary judgment.

V.     ANALYSIS

The antiretaliation provision of Title VII shields those who participate in EEO procedures or oppose discrimination.  The Act states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). Watkins remains employed by the DOC in the same role he held prior to engaging in his protected activity. He has voluntarily dismissed his claim that he suffered a discrete

instance of retaliation under the Act, but contends that Counts II and III of his Amended Complaint should proceed to trial on the theory that he was subjected to a retaliatory hostile work environment. (*See* Docket No. 39).

Recognizing "that less severe isolated incidents which would not themselves rise to the level of retaliation may, when taken together as part of 'the overall scenario,' evidence retaliatory animus," the Court of Appeals has held that "'our usual [discriminatory] hostile work environment framework applies equally' to claims of retaliatory hostile work environments." *Komis* v. *Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 293-94 (3d Cir. 2019) (quoting *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006) (overruled, in part, by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)); also quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1484 (3d Cir. 1990)). Additionally, this Court has acknowledged that employees may bring claims of a retaliatory hostile work environment based on the conduct of peers and supervisors in response to protected activity. *King v. Pa. Dep't of Corrections*, 2020 WL 2897019, at *7 (W.D. Pa. 2020) (Fischer, J.).

Under the established framework, a plaintiff pursuing a retaliatory hostile work environment claim must show: (1) that he suffered intentional discrimination because of his protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination was subjectively detrimental; (4) the discrimination was objectively detrimental to a reasonable person in like circumstances; and (5) there is a basis for employer liability. *Komis*, 918 F.3d at 293 (citing *Jensen*, 435 F.3d at 449). Because Watkins has failed to put forth sufficient evidence proving a *prima facie* case for a retaliatory hostile work environment, his remaining claims at Counts II and III of his Amended Complaint must be dismissed. The Court will address the relevant prongs of analysis, in turn.

### A.    First Prong - Causation

The analysis begins with the question of causation, i.e. whether the conduct Watkins complains of was undertaken by his contemporaries and superiors *because of* his prior protected activity. The Supreme Court has held that, unlike with status-based discrimination claims, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Cent. v. Nassar*, 570 U.S. 338, 352 (2013). In *Jensen v. Potter*, the Court of Appeals described the gatekeeping function of the causation prong of the hostile environment analysis, as follows:

> The test's first element concretely expresses the principle that Title VII is not "a general civility code for the American workplace." Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief. This first step, therefore, requires us to identify what harassment, if any, a reasonable jury could link to a retaliatory animus.

*Jensen v. Potter*, 435 F.3d at 449-50 (internal citations omitted).

In the context of discrete retaliation claims, the Court of Appeals held that "[w]e consider 'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015) (citing *LeBoon v. Lancaster Jewish Community Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007)). Where there is an "unusually suggestive" temporal proximity between the retaliation and the protected activity, the timing of the conduct alone may be sufficient to prove causation. *Id.*; *see also Jensen,* 435 F.3d at 450 (temporal proximity also sufficient to prove causation for a retaliatory hostile work environment claim.). There is no bright line rule for determining what amount of time is unusually suggestive of retaliation, but the Court of Appeals has held that intervening periods of three and five months are not sufficient to demonstrate causation. *LeBoon*, 503 F.3d at 233 (holding three-month gap between the protected activity and the adverse action, without more, cannot create an inference of causation in order to defeat summary judgment); *see also Andreoli v.*

*Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (holding five-month time period between complaint and first adverse action insufficient by itself to support inference of causation). On the other hand, "[w]here the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference'" of causation. *LeBoon*, 503 F.3d at 232 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). Importantly, however, "the plaintiff [...] cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels*, 776 F.3d at 196 (string citation omitted).

### 1.     *Vanderslice* Testimony/First EEOC Charge

Here, Watkins first engaged in protected conduct under Title VII in November of 2018, when he testified in support of Michelle Vanderslice's gender discrimination claim against the DOC. (Docket No. 36-2 at 6). His deposition was conducted off-site at the Mercer County courthouse, and none of his colleagues or supervisors from SCI Mercer were present during his deposition testimony. (*Id.* at 6-7).  When questioned about their knowledge of *Vanderslice* litigation, neither Adams nor Robbins indicated any knowledge of Watkins' involvement therein, and both denied any detailed knowledge about that case. (Docket No. 36-3 at 15; *See* Docket No. 36-6 at 15). Johnson and Rouda were not questioned about the *Vanderslice* litigation or Watkins' involvement therein. (*See* Docket Nos. 36-4; 36-7). In total, nothing in the record indicates that any of Watkins' alleged harassers were implicated by, involved in, or even aware of his testimony in *Vanderslice*.

Likewise, Watkins fails to demonstrate any connection between his alleged harassers and his first EEOC complaint. The same was filed on June 7, 2019 based on Watkins' belief that unnamed DOC officials refused to hire his wife, Michelle Watkins, in retaliation for Watkins'

unfavorable testimony in the *Vanderslice* case. (Docket No. 36-2 at 14-15). Following his first EEOC charge, Watkins contends that he was subject to further retaliation at work, including his shift reassignment on June 8; his performance review from Johnson and Robbins on June 26; Robbins' accusation that he abandoned his post on June 26; Brocklehurst's order on June 26 about meeting with the corrections trainees on behalf of the union; and Johnson's "living hell" comments on June 27. Since each of these instances of supposed harassment predates Watkins' second EEOC charge on July 19, 2019, Watkins must present evidence showing some causal nexus to either his first EEOC complaint or his *Vanderslice* testimony. In this Court's estimation, he has failed to do so.

At the outset, the Court notes that there is no unusually suggestive temporal link between these incidents and Watkins' protected activity. Watkins' deposition testimony was given in November of 2018, yet the perceived harassment did not begin until early June of 2019. In light of established Third Circuit jurisprudence, Watkins has failed to demonstrate that this seven-month gap in time is unusually suggestive. *LeBoon*, 503 F.3d at 233 (three-month gap does not give rise to inference of causation); *see also Andreoli*, 482 F.3d at 650 (five-month gap insufficient to support inference of causation). Though a much shorter period of time separates Watkins' first administrative filing and the alleged conduct of the DOC officials in June of 2019, he has also not presented sufficient evidence to establish that the temporal proximity between these events is unusually suggestive. A copy of Watkins' first EEOC complaint was faxed to the HR department at SCI Mercer on June 10, 2019, two days *after* Watkins' reassignment to housing unit NB. (Docket No. 36-3 at 28). The remaining conduct about which Watkins complains following his first EEOC charge did not take place until June 26-27, 2019. The Court does not believe that an intervening period of two-and-a-half weeks is, on its own, suggestive of retaliation. Thus, the Court must look

to the remaining evidence in the record to determine whether it is sufficient to demonstrate causation. *LeBoon*, 503 F.3d at 232 (citing *Farrell*, 206 F.3d at 280).

Considering the entirety of the evidentiary record before the Court, Watkins has not proffered any evidence showing that his alleged harassers were aware of his prior protected activity. When Watkins' first EEOC complaint was faxed to the HR department at SCI Mercer on June 10, (Docket No. 36-3 at 28), it would have been received by Mahlmeister, Laughery, or another HR clerk and provided shortly thereafter to Adams. (Docket Nos. 36-2 at 15-16; 36-3 at 23-24). Accordingly, while the evidence supports an inference that Adams and some members of the HR staff were aware of Watkins' first administrative filing as of June 10, 2019, none of these individuals are alleged to have participated in the workplace harassment he purportedly suffered. With respect to those who were active participants in the alleged harassment – particularly Johnson, Robbins, and Brocklehurst - Watkins offers nothing more than the blanket assertion that "everybody" at SCI Mercer knew about his first EEOC filing because "there's no secrets in jail" to establish that they were aware of his protected activity in June of 2019. (Docket No. 36-2 at 15).

The Court of Appeals has rejected the idea that such unsupported speculation is sufficient to establish a causal nexus between protected activity and perceived retaliation. *See Daniels*, 776 F.3d at 197 ("a [plaintiff] cannot justifiably rely on mere speculation that these adverse actors learned of her [administrative] complaints from other employees"). Consistent with *Daniels*, the Court does not believe that Watkins' unsupported and self-serving deposition testimony that "everybody" at SCI Mercer knew about his first administrative complaint is sufficient, without more, to create a material question of fact as to whether Johnson, Robbins, and Brocklehurst were aware of the same in June of 2019. Nor has Watkins presented the Court with any evidence which shows that Johnson, Robbins, or Brocklehurst were in any way involved in the decision about

whether to hire Michelle Watkins, such that they would have been named in, or otherwise implicated by, the first EEOC complaint. Thus, Watkins cannot show a causal link between their actions on June 26 and 27, 2019 and Watkins' prior protected activity. *See Daniels,* 776 F.3d at 196-97 ("The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.") (citing *Andreoli*, 482 F.3d at 650); *cf. Ambrose v. Twp. of Robinson,* 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct."). Quite simply, the evidentiary record is devoid of any facts which would support an inference that these individuals' actions in June of 2019 were motivated by retaliatory animus.

### 2.    Second and Third EEOC Complaints

Unlike his first charge, Watkins' second EEOC complaint, which was filed on July 19, 2019, contained allegations against Johnson, Robbins, and Brocklehurst. (Docket No. 36-2 at 27-28). Because they were the subjects of the second EEOC complaint, Third Circuit precedent holds that a reasonable factfinder could infer that these individuals were aware of the fact that a charge had been brought against them by Watkins. *See Daniels*, 776 F.3d at 197 ("A factfinder potentially could infer that [the harassers] knew of [the plaintiff's] February 2011 PHRC complaint because it contained specific allegations against them."). Accordingly, any actions Johnson, Watkins, or Brocklehurst undertook toward Watkins after July 19, 2019 must be scrutinized with the assumption that they were aware of Watkins' protected activity. Watkins has raised additional allegations against Johnson and Robbins which postdate his second EEOC charge, though Brocklehurst is not alleged to have engaged in any additional harassment directed toward Watkins after July 19, 2019.

14

Less than one week after the second EEOC complaint was filed, Johnson accused Watkins of abandoning his post on July 24, 2019. (Docket No. 36-2 at 26-27). Watkins alleges that Johnson falsified this claim against him, though the specifics of this incident do not appear in the record. Another fact-finding hearing was convened, but no discipline ensued. (*Id.*). Given the unusually suggestive temporal proximity between the second EEOC charge on July 19 and Johnson's accusation on July 24, a reasonable fact finder could infer a causal nexus between these events.

Further, two and half months later, after Watkins filed his third EEOC complaint on August 5, 2019, Johnson left the disputed voicemail for Muszynski in October of 2019. (Docket No. 36-2 at 30; 35-36). The precise language used by Johnson in the voicemail is unknown to the Court, as neither a recording of the message nor a transcript of its contents appears in the record. Though the parties disagree about whether the voicemail even makes reference to Watkins, (*See* Docket Nos. 36, 40 at ¶ 47), the Court is bound to accept Watkins' contention as the non-moving party that the voicemail from Johnson questions his masculinity. *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Considering the totality of Johnson's actions following the second EEOC charge, a reasonable factfinder could determine that there was a causal link between Johnson's actions after July 19, 2019 and Watkins' protected activity.

Next, the Court turns its attention back to Robbins. Both Watkins' second and third administrative complaints raised claims against Robbins. (Docket No. 36-2 at 30). Watkins believes that the verbal reprimand he received on August 6, 2019, (Docket No. 36-9 at 1), was the result of Robbins commencing an investigation and falsifying evidence against him throughout the disciplinary process in order to retaliate against him. (Docket No. 36-2 at 30, 39-41). However, the record shows that Robbins brought the allegations of insubordination and abandoning the post

15

against Watkins on June 26, 2019, and that he gave his sworn statement relating thereto on the same date. (*Id.* at 2-5). Further, the investigative report relating to this incident, which was the basis for the discipline, was released on July 17, 2019, two days before Watkins' second EEOC complaint was filed. (Docket No. 36-9). Accordingly, although the verbal reprimand was issued to Watkins after his second and third EEOC charges raised claims against Robbins, the disciplinary proceedings had been commenced well before Watkins' relevant protected activity, and Watkins offers no other evidence to establish a causal link between Robbins' conduct throughout the disciplinary process and Watkins' administrative complaints.

The record reveals no other instances wherein Robbins is alleged to have retaliated against Watkins.  However, Watkins does claim that Robbins' wife, Rouda, retaliated against him for filing the charges against her husband. (Docket No. 36-2 at 30, 32-33). On December 19, 2019, Rouda sent an email to Watkins' shift supervisors accusing him of failing to complete his cell inspections during his December 17 shift. (*Id.* at 32). Watkins contends that this allegation was false, and that he replied to her email with a photo of a logbook showing that the inspections had been completed, as required, on the date in question. (*Id*. at 30, 32-33). Here, the timing of Rouda's email is not unusually suggestive of retaliation, as it was sent four and a half months after Watkins' most recent EEOC filing against her husband. *See Andreoli*, 482 F.3d at 650 (five-month gap since protected activity insufficient by itself to support inference of causation). Therefore, the Court must once again look to the totality of the circumstances to determine whether an inference of causation can be drawn. *LeBoon*, 503 F.3d at 232 (citing *Farrell*, 206 F.3d at 280).

Rouda testified that she was unaware of Watkins' EEOC filings in 2019 and 2020. (Docket No. 36-7 at 13). Further, she testified that she and Robbins never spoke about Watkins at home. (*Id.* at 14). Likewise, Robbins testified that he and Rouda do not discuss work matters outside of

work, and that they have never had a discussion about Watkins. (Docket No. 36-6 at 25-26).  The Court was unable to find any case law which addresses the situation here, wherein the spouse of an individual named in an EEOC charge is alleged to have retaliated on their spouse's behalf. Absent authority to the contrary, the Court does not believe that the spousal relationship between Rouda and Robbins, alone, is sufficient to establish a causal relationship between Rouda's email and the two EEOC charges Watkins filed against Robbins. Watkins provides no other evidence which demonstrates that Rouda was aware of his EEOC filings in December of 2019. Accordingly, the Court does not believe that a reasonable finder of fact could infer that Rouda acted with a retaliatory motive when sending her email about the cell inspections.

### 3.    Fourth and Fifth EEOC Complaints

Moving on, Watkins has not met his burden of establishing causation between his remaining claims of harassment and his protected conduct. His fourth EEOC complaint was filed on February 10, 2020 and faxed to HR the next day. (Docket No. 36-3 at 29). The subject thereof was Watkins' ongoing issues with his paychecks. (Docket No. 36-2 at 64-65). Watkins does not identify the specific nature of the payroll errors, and he admits to experiencing similar errors prior to the onset of the harassment about which he now complains. (*Id.*).

Watkins provides no evidence to "connect the dots" between his EEOC complaints and his return to work a light duty post in May of 2020 following a bicep injury which required surgery. (Docket No. 36-2 at 41-43). The injury occurred when Watkins lifted a stack of food trays for the inmates. (*Id.* at 41-42). Watkins finished his shift, but sought medical attention immediately thereafter, and underwent surgery at the end of April 2020. (*Id.* at 42-43). Two weeks after his surgery, Watkins was cleared to return to work in a light duty capacity, only to find that all of the approved light duty posts were already filled. (*Id.* at 43-44, 66-67). The DOC created a new light

17

duty post, third shift lobby, for Watkins, allowing him to come to work and be paid as if he had completed a regular shift. (*Id.* at 66-67). That Watkins was displeased with his light duty post is of no significance to his claim of retaliation. The only relevant question here is whether Watkins' protected activity was the but-for cause of his assignment to this post. *Nassar*, 570 U.S. at 352.

The timing of his injury assignment to the third shift lobby is not unusually suggestive of retaliation, as his return to work a light duty post came nearly three months after his fourth EEOC filing in February of 2020. *LeBoon*, 503 F.3d at 233. Further, Watkins has not shown that the totality of the circumstances support an inference of retaliatory animus. Watkins sustained a workplace injury two months after filing his fourth EEOC charge. Upon being cleared to return to work, Watkins was assigned to a light duty post by unidentified DOC officials in light of of his medical restrictions. Once again, Watkins has failed to meet his burden of demonstrating a causal connection between his post-injury assignment and his prior protected activity.

Watkins filed his fifth and final EEOC charge on July 28, 2020, complaining about his post-injury assignment to the third shift lobby. (Docket No. 36-2 at 65-67). He claims that the retaliatory harassment continued upon his return from injury leave on September 1, 2020. (*Id.* at 48, 59). At the time Watkins returned to full duty, he accepted a shift bid for the third shift, in part to get away from Johnson on the first shift. (*Id.* at 48-49). A few weeks after Watkins began working third shift, Johnson was also reassigned to third shift. (Docket No. 36-2 at 68-69).  In the Court's view, the approximately one-and-a-half months between Watkins' fifth EEOC charge and Johnson's reassignment to the third shift is not unusually suggestive, particularly where neither the fourth or fifth EEOC filings involved Johnson and the evidence does not show that he was aware of the same. *Daniels*, 776 F.3d at 196 ("the plaintiff […] cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of

the plaintiff's protected conduct at the time they acted.").

Nor does the totality of the circumstances suggest a causal relationship between Watkins' protected activity and Johnson's reassignment to third shift in September of 2020. Watkins testified that he was unaware of the reason for Johnson's reassignment to the third shift, (*Id*. at 50), while Johnson indicated that the same was done to accommodate custody arrangements for his own children. (Docket No. 36-4 at 9). In light of this evidence, Watkins' bare speculation that Johnson moved to the third shift to continue retaliating against him, (Docket No. 36-2 at 68-69), is insufficient to raise a genuine issue of material fact as to this issue. *See Conboy*, 992 F.3d at 160 (A party opposing summary judgment may not rest upon the "mere allegations, speculations, unsupported assertions or denials of its pleadings" and must come forward with more than "some metaphysical doubt as to the material facts."); *see also Matsushita.*, 475 U.S. at 586-87. Further, Watkins admits that he did not experience any actual instances of harassment or retaliation from Johnson while working the third shift together. (Docket No. 36-2 at 72). In the Court's estimation, the evidence of record is insufficient to permit a fact finder to infer that Johnson's reassignment to the third shift was motivated by retaliatory animus.

Likewise, Watkins' claim that Mitchell retaliated against him following his return to full duty is not factually supported. The record demonstrates that: Watkins was required to complete statewide firearms training for the year 2020; he had not completed his training for that year; he was physically able to complete said training as of September 1, 2020 after returning to full duty following his bicep injury; and, it was the training coordinator's responsibility to provide make up dates for those who missed their training. (Docket No. 36-2 at 58-62). Mitchell sent Watkins a single email informing him of his duty to complete this training, and scheduled him for an overtime mandate to complete the same. (*Id.* at 60). The email itself was not made part of the record, nor

does the evidence specify the date it was sent, though it was presumably after Watkins returned to full duty on September 1, 2020. As previously discussed, the temporal proximity of at least one and a half months between Watkins' most recent EEOC charge and Mitchell's email is not unusually suggestive of retaliation. Further, Watkins fails to point to any evidence which would demonstrate that Mitchell was aware of or implicated in Watkins' prior protected activity. *See Daniels*, 776 F.3d at 196 (A plaintiff cannot establish that there was a causal connection without some evidence that the individuals responsible knew of the plaintiff's protected conduct at the time they acted.). Quite simply, the Court fails to discern any connection between Mitchell's actions and Watkins' administrative findings, such that a reasonable finder of fact could infer a causal connection between the two.

### 4.     Summation

All told, much of the conduct Watkins perceives to be retaliatory harassment is wholly unrelated to his protected activity in the Court's view. However, given the nature of the allegations in Watkins' second EEOC complaint, which specifically raises claims against Johnson, the Court finds that a reasonable factfinder could infer a causal link between Watkins' protected activity and some of Johnson's actions. *See LeBoon*, 503 F.3d at 232; *Farrell*, 206 F.3d at 280. In particular, Johnson's July 24, 2019 accusation that Watkins abandoned his post, as well as the October 21, 2019 voicemail he left for Muszynski, are sufficient to support an inference of causation in the wake of the July 19, 2019 EEOC complaint Watkins filed against him.

### B.     Second Prong - Severe or Pervasive Harassment

Next, under the second prong of the hostile work environment analysis, the Court considers the nature and extent of the harassment that Watkins allegedly endured. The Court of Appeals has noted that not all workplace conduct that may be described as harassment rises to the level of a

hostile work environment. *Clegg v. Falcon Plastics, Inc.*, 174 F. App'x 18, 25 (3d Cir. 2006). Instead, only harassment which is "severe or pervasive" is sufficient to establish an actionable claim. *Castleberry v. STI Group*, 863 F.3d 259, 264 (3d Cir. 2017) (clarifying that the correct standard under the second prong is "severe or pervasive," not "severe and pervasive" or "pervasive and regular") (citing *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004) and *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). Indeed, "'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry*, 863 F.3d at 264 (citing *Jensen*, 435 F.3d at 449 n.3). Ultimately, "[w]hether an environment is hostile requires looking at the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). The discriminatory "conduct must be extreme [enough] to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (quoting *Breeden*, 532 U.S. at 270 (reiterating that for an atmosphere of harassment to be actionable, the conduct must be sufficiently severe or pervasive that it "alter[s] the conditions of the victim's employment" to create an "abusive working environment")).

For the following reasons, this Court is of the opinion that Watkins has failed to set forth facts which show that he was subjected to either severe or pervasive harassment which tainted his working environment. Despite Watkins' complaints about a number of matters beginning in June of 2019, he remains employed by SCI Mercer in the same role as a corrections officer that he held in November of 2018, when he first engaged in protected activity by giving deposition testimony

in *Vanderslice*.

### 1.    Post Reassignment

Watkins was reassigned from his usual post to housing unit NB in June of 2019. However, he admits that there are no "punishment posts" at SCI Mercer, (Docket Nos. 36, 40 at ¶ 28), and he failed to submit any evidence demonstrating that the change to housing unit NB was accompanied by a change in his scheduled hours, his compensation, his job responsibilities, or his rank. The Court of Appeals has held that lateral transfers which do not materially change the terms or conditions of employment are generally insufficient to support a claim of retaliation. *See Stewart v. Union Cnty. Bd. of Educ.*, 655 Fed.Appx. 151, 157 (3d. Cir. 2016) (unpublished).

### 2.    Performance Review

 Likewise, Watkins has not established that his "satisfactory" rating on his annual performance evaluation from Johnson and Robbins in June of 2019, though perhaps subjectively disappointing, had any tangible effect on his employment.  In fact, Watkins admittedly did not follow up with his superiors about why his annual review was not in line with his expectations. (Docket No. 36-2 at 24). Thus, in the Court's opinion, Watkins' disappointing evaluation in 2019 was not severe. *See McKinney v. Univ. of Pittsburgh*, 2018 WL 6603632, at *7 (W.D. Pa. 2018) (Fischer, J.) (citing *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (lower performance ratings were not actionable unless accompanied by "tangible job consequences")). Watkins also admits that both prior and subsequent evaluations gave him higher ratings. (*See* Docket No. 36-2 at 23). As such, Watkins also failed to show a pattern of pervasive negative reviews.

### 3.    Robbins' Discipline

Unlike the other instances of harassment of which Watkins complains, Robbins' June 26, 2019 accusation that Watkins was insubordinate and abandoned his post had a tangible impact on

his employment with the DOC, as it resulted in formal discipline in the form of a verbal reprimand. (*Id.* at 27). Despite its title, a verbal reprimand at the DOC is actually a written document placed in the recipient's disciplinary file and prevents him or her from transferring among DOC locations, changing jobs, or advancing in rank for a period of two years. (Docket No. 36-2 at 34-35). However, the fact that Watkins was subject to discipline which had a tangible impact on his employment is not, alone, sufficient to prove severe or pervasive harassment. Our Court of Appeals has noted that "the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances." *Jones v. Se. Pa. Trans. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015).

Here, Watkins admits a majority of the facts in relation to the June 26 incident, namely that: he was selected for an overtime shift; he asked Robbins to be excused to attend an appointment; Robbins asked to see documentation relating to the appointment; and, ultimately, he did not work the overtime mandate. (Docket No. 47-1 at 8-11). Though the parties disagree about whether Robbins and/or Lt. Michael Stull excused Watkins after he was selected for the overtime shift, (Docket No. 36-2 at 39-41; *see* Docket No. 47-1), this dispute does not raise a genuine issue of material fact given the Court's previous finding that Watkins has failed to produce any evidence which ties Robbins' actions in bringing the disciplinary charges to Watkins' first EEOC complaint or his testimony in *Vanderslice*. Simply because Watkins does not agree with the outcome of the disciplinary proceedings brought against him does not mean that the resulting discipline constitutes severe or pervasive harassment.

### 4.    Brocklehurst's Order

Next, the Court considers Brocklehurst's order forbidding Watkins from meeting with corrections trainees on behalf of the union during work hours. While this order represented a

departure from prior practice, (Docket No. 36-2 at 29), the Court cannot discern how this amounted to a change in the terms and conditions of Watkins' employment with the DOC. Though related, Watkins' respective positions with the union and the DOC were distinct. The DOC employed Watkins to fulfill the duties of a corrections officer. On the other hand, the union members elected Watkins to serve as their president, (Docket No. 36-2 at 19), and provided him with separate compensation for serving in that role, including a quarterly stipend, payment of his utility bills, and additional time off for union business leave and union administrative leave. (*Id*. at 21). While Brocklehurst's order undoubtedly affected Watkins in his role as union president, his duties as a corrections officer remained unchanged by the same. The Court does not believe that the order not to meet with trainees during work hours amounted to severe or pervasive harassment which altered the conditions of Watkins' employment with the DOC.

### 5.    Johnson's Conduct

In this Court's estimation, Johnson's actions toward Watkins between June and October of 2019 also do not amount to severe or pervasive harassment. Viewing the facts in the light most favorable to Watkins, Johnson made comments to Jones about being able to make Watkins' life a "living hell" on June 27, 2019, (Docket No. 42-3), and he also challenged Watkins' masculinity in the voicemail message left for Muszynski on October 19, 2021. (*See* Docket No. 36-2 at 35-36). Neither comment was made directly to Watkins. (*Id.* at 23, 36). While Johnson acted unprofessionally and in poor taste toward his subordinates on both occasions, his words were not so derogatory, threatening, or otherwise severe enough to transform Watkins' work environment. Established caselaw holds that neither "[t]he mere utterance of an epithet, joke, or inappropriate taunt that may cause offense," *Weston v. Pennsylvania,* 251 F.3d 420, 428 (3d Cir. 2001) (overruled, in part, on other grounds by *Burlington*, 548 U.S. at 126), nor "'simple teasing,' offhand

comments, and isolated incidents (unless extremely serious)," are sufficiently severe or pervasive to be actionable. *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)). Additionally, the sum total of Johnson's unprofessional comments to others about Watkins included two verbal outbursts approximately four months apart, which is insufficient to establish that Watkins was subjected to a pervasive atmosphere of verbal harassment. *Compare Hendricks v. Pittsburgh Public Schools*, 2014 WL 4641167, at *8 (W.D. Pa. 2014) (Fischer, J.) (Discriminatory "comments were made at a frequency that was sporadic, at most, and certainly could not be considered regular or pervasive."), *with King v. Pa. Dep't. of Corr.*, 2020 WL 5505367 (W.D. Pa. 2020) (Kelly, M.J.) (finding severe or pervasive hostile work environment based on gender where the plaintiff was repeatedly reassigned to another unit because a superior did not like working with females, where games were played at the expense of female employees, where video was circulated of the plaintiff's reaction when a male coworker twice dropped his pants in front of her, and where a drawing of the plaintiff in a sexually explicit position was "plastered" throughout the workplace).

Regarding Johnson's accusation that Watkins abandoned his post on July 24, 2019, which came in the wake of Watkins' second EEOC charge on July 19, 2019, the record before the Court shows only that the accusation was made by Johnson, that a fact-finding hearing was convened, and that no discipline ensued. (Docket No. 36-2 at 26-27). Watkins was not asked at his deposition to elaborate about the nature of his interaction with Johnson on July 24, 2019, nor did he expand upon or explicitly reiterate the allegations from his Amended Complaint that he was falsely accused by Johnson in relation to this incident. (*Id.* at 24-27). Likewise, Johnson was not asked a single question about the July 24 accusation during the course of his deposition. (*See* Docket No. 36-4). The allegations in Watkins' Amended Complaint that Johnson falsely accused him of

25

disobeying orders and abandoning his post, (Docket No. 17 at ¶¶ 24(a-b)), are insufficient to oppose summary judgment. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

This Court has previously recognized that "courts generally hold that an internal investigation does not constitute an adverse employment action for Title VII retaliation purposes unless it results in discipline or some other cognizable injury." *McKinney*, 2018 WL 6603632, at *7 (collecting cases). Similarly, the Third Circuit Court of Appeals has held that "the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances." *Jones*, 796 F.3d at 326. Thus, without any additional context, and in light of the fact that no discipline resulted therefrom, Watkins fails to demonstrate that Johnson's accusation on July 24 constitutes severe or pervasive harassment.

Hence, the record before the Court does not demonstrate that any one incident involving Johnson was so severe as to alter the terms and conditions of Watkins' employment with the DOC, nor does it show that the totality of Johnson's actions amounted to pervasive harassment which contaminated the workplace for Watkins.

### 6.    Email Reprimands

The Court next turns its attention to the emails from Rouda and Mitchell. These messages were sent to remind Watkins of his obligations to complete required cell inspections and firearms training, respectively. Watkins admits that he did not complete the firearms training which was the subject of Mitchell's email, (Docket No. 36-2 at 61), though he disputes the veracity of Rouda's

allegation that his cell inspections were incomplete. (*Id.* at 32-33). From the evidence before the Court, it does not appear that Watkins suffered any discipline following either email, and he admits that he did not receive any follow-up communications from the DOC about either matter. (*Id.* at 33; 61-62). These facts are simply insufficient to support a finding of severe harassment. *See, e.g.*, *McKinney*, 2018 WL 6603632, at *7 (citing *Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011)) (holding that written reprimands, even if undeserved, had no "tangible consequences" and could not be considered adverse employment actions). Nor does the evidence before the Court show that the emails from Rouda and Mitchell were part of a larger pattern of conduct directed toward Watkins, such that they would support a finding of pervasive harassment. Ultimately, the Court does not believe that a reasonable fact finder could determine that these emails amounted to severe or pervasive harassment which altered the terms and conditions of Watkins' employment with the DOC.

### 7.        Payroll Errors

Finally, Watkins has failed to meet his burden to establish that the payroll errors amount to severe or pervasive harassment. In fact, Watkins admits that he has not followed up with the state agency in charge of the same in order to resolve this issue, (Docket No. 36-2 at 79), and that he experienced similar errors in the past. (*Id.* at 64). Further, as previously discussed, the evidence Watkins presents neither ties these errors to his protected conduct, nor links them to any of his alleged harassers. Thus, while Watkins seems to be experiencing issues with the accuracy of his paychecks, the Court does not believe that a reasonable factfinder could characterize the same as severe or pervasive harassment.

### 8.        Totality of Evidence

In summary, over a period of nearly two years, during which time Watkins filed five

different EEOC complaints:

- His shift post was changed temporarily without any reduction in rank or compensation;

- He received one performance review that did not meet his expectations;

- He received one verbal reprimand after failing to work an overtime shift;

- He was ordered not to conduct union business during work hours;

- He was the subject of one additional fact-finding which resulted in no discipline;

- He was twice the focus of unprofessional verbal outbursts from a superior;

- He received two emails from DOC employees reminding him of various work responsibilities he needed to complete;

- He was assigned to a new light duty post following an injury; and

- He frequently experienced payroll errors.

These instances of perceived harassment stem from a variety of actions by Watkins' peers and supervisors. Even assuming Watkins could provide evidence linking all of these incidents to one another and, in turn, to his protected activity, the Court simply does not believe that the sum total of these actions "alter[ed] the conditions of the victim's employment" to create an "abusive working environment." *Breeden*, 532 U.S. at 270. In fact, despite all of his complaints, Watkins remains employed at SCI Mercer in the same role he held prior to first engaging in protected activity in November of 2018. All things considered, the Court does not believe that a reasonable factfinder could conclude that Watkins was the subject of severe or pervasive harassment.

### C.      Fifth Prong - Basis for Employer Liability

Finally, the fifth prong of the analysis asks whether there is a basis for holding the employer responsible for the hostile work environment. The Supreme Court has found that there is an important distinction to be drawn between harassment perpetrated by a co-worker and that which is committed by a supervisor. *See Vance v. Ball State Univ.*, 570 U.S. 421 (2013). Where a co-worker is responsible for the harassment in question, "the employer is liable only if it was negligent

28

in controlling working conditions." *Vance*, 570 U.S. 421, 424. On the other hand, in instances where a supervisor commits harassment, different rules apply. "If the supervisor's harassment culminates in a tangible employment action (i.e., 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits[...] the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing [...] an affirmative defense.'" *Id.* (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (internal citation omitted). This "*Ellerth/Faragher* affirmative defense" permits the employer to avoid liability for its supervising employee's harassment of a subordinate by proving: (1) that the employer exercised reasonable care to prevent and correct any harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Id.*

The Supreme Court held in *Vance* that the question of whether a harasser is a "supervisor" for the purposes of a Title VII claim is not determined by the everyday definition of that term, i.e. whether the actor has "the ability to exercise significant direction over another's daily work." *Id.* at 431 (quoting *Ellerth*, 524 U.S. at 461). Rather, a person is only a supervisor for Title VII purposes when he or she has been "empowered [...] to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.*

In the present case, Watkins has not established that any of his perceived harassers had the power to take tangible employment actions against him, as contemplated in *Vance*. As discussed in the prior sections of this opinion, most of Watkins' complaints did not result in an adverse

employment action. In the sole instance where Watkins received formal discipline, the evidence of record shows that while Robbins initiated the disciplinary proceedings following the June 26, 2019 overtime incident, and Brocklehurst recommend discipline relating thereto, it was ultimately Adams who approved Watkins' verbal reprimand. (*See* Docket No. 36-9). Hence, it is uncontested in the record that neither Robbins nor Brocklehurst could unilaterally take tangible employment action against Watkins, such that they would be considered his "supervisor" for Title VII purposes. It is even more dubious what power, if any, Johnson or Rouda could exercise over the terms of Watkins' employment.

Since Watkins has not provided evidence showing that any of the accused harassers meets the definition of a "supervisor" set forth by our Supreme Court, they must each be treated as "co-workers" for the purpose of this analysis. Accordingly, to establish a basis for employer liability, Watkins must show that the alleged harassment resulted from the DOC's negligence in controlling working conditions. *Vance*, 570 U.S. 421, 424. The Court cannot discern any facts in the record which create a triable issue as to the DOC's negligence here.

VI.     CONCLUSION

For the reasons stated herein, the DOC is entitled to summary judgment on Watkins' remaining claims of a retaliatory hostile work environment at Counts II and III of his Amended Complaint. An appropriate Order follows.


                                          *s/Nora Barry Fischer*
                                          Nora Barry Fischer
                                          Senior U.S. District Judge

cc/ecf:  All counsel of record.